IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DANIEL W. PHOENIX,

     **Plaintiff,**

v.                                **Civil Action No. 3:23cv316**

HAROLD CLARKE, *et al.*,

     **Defendants.**

## MEMORANDUM OPINION

Daniel W. Phoenix,[1] a former Virginia inmate and frequent litigant, filed this 42 U.S.C. § 1983 action.[2] In his Amended Complaint ("Complaint," ECF No. 38), Phoenix argues that while he was an inmate in the Deerfield Correctional Center ("DCC") and in the St. Bride's Correctional Center, he was denied adequate medical care for his hearing loss and tinnitus because his receipt of hearing aids was delayed. The matter is before the Court on the Motion for Summary Judgment (ECF No. 67) filed by remaining Defendants.[3] The Court provided

---

[1] Phoenix changed his name from Daniel W. Jamison to Daniel W. Phoenix during the pendency of this litigation.

[2] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[3] By Memorandum Opinion and Order entered on August 25, 2025, the Court dismissed any claim against Defendant F-NP Fairington (F-NP is undefined) for lack of service. (ECF Nos. 65, 66.) On January 5, 2026, the Court dismissed the claims against Defendants Clarke, Amonette, Herrick, Miller, Watson, Oates, Terry, Shaw, Abrams-Godfrey, Harris, Ridely, and Powell. (ECF Nos. 78, 79.) On October 21, 2025, Defendants Dr. Alvin Harris, Advanced Practice Registered Nurse ("APRN") Steven Marinos, J. Schnur, RN, and Dr. Kshitij Sharma

Phoenix with notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). (ECF No. 70.) After receiving several extensions, Phoenix filed a Response. (ECF No. 75.) As discussed below, the Motion for Summary Judgment will be GRANTED.

## I. Procedural History and Remaining Claims

As the Court noted in its January 5th, 2026 Memorandum Opinion,

> Phoenix's Complaint is repetitive and names as a defendant any person who may have heard or potentially read his complaints about his desire for hearing aids amongst his many other ailments.[4] The Complaint is short on useful facts and

("Defendants") filed a Motion for Summary Judgment. (ECF No. 67.) The Court corrects the spelling of the Defendants' names.

[4] The Court cannot review this case in a vacuum. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (explaining that a Court may review other court records); *Clay v. Yates*, 809 F. Supp. 417, 427–28 (E.D. Va. 1992) ("it is appropriate to consider what the court's records show about the number and kinds of cases instituted by the *pro se* litigant, and the extent to which the conduct of that litigant constitutes and an abuse of the judicial process" (citations omitted)). The Court notes that, in addition to his complaints about hearing loss and tinnitus, simultaneously, Phoenix complained incessantly to many of the same Defendants about his neck, back, arm, elbow, and shoulder injuries, an ankle injury after a fall off a van, celiac disease, other food sensitivities, pulmonary and breathing issues. *See, e.g.*, *Phoenix v. Vital Core Health Strategies*, No. 23cv357, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025) (explaining that between 2019 and 2024, Phoenix complained about "celiac disease, a torn bicep tendon, neck and back injuries, hearing issues, breathing issues, dental problems and other ailments" and "was seen scores of times for these medical issues."); *Phoenix v. Herrick*, No. 3:23cv335 (E.D. Va. filed May 18, 2023) (suing over fall from transport van and treatment for ankle injury). In one lawsuit alone filed in this division, Phoenix claimed that he had "celiac disease, inguinal hernia, umbilical hernia, serious neck and back pain with nerve pain, hemorrhoids, pain management, dermatitis hepiformas, foot problems, malnutrition, tinnitus in ears, dental erosion, and mental problems," as well as peripheral neuropathy and paresthesis. *Jamison v. Northam*, No. 3:20cv339 (E.D Va. May 13, 2020), ECF No. 1, at 8, 14 (spelling and capitalization corrected).

Between August 2019 and 2024, Phoenix filed at least nineteen lawsuits in this division alone challenging various aspects of his medical care that have required the Court to expend a great deal of time and resources to resolve. Phoenix has filed vexatious and repetitive lawsuits against numerous VDOC employees, medical providers, and even attorneys for the Commonwealth charged with defending the actions, for every alleged ailment simply because he was dissatisfied with the level and type of care he received. While some of Phoenix's medical

2

details. Instead, it mostly consists of a list of dates that Phoenix met with various Defendants, and a list of letters and grievances that he submitted, and his terse conclusions that he was ignored or no one offered him "corrections."

(ECF No. 78, at 4.) The Court construed Phoenix to raise the following claims for relief:

Claim One: Defendants violated Phoenix's Eighth Amendment[5] rights "for their actions . . . on not making corrections to the violations" and "for not providing medical care or medical aids for his serious medical condition of hearing loss and tinnitus . . . ." (ECF No. 38 ¶ 57; *see id.* at 14–19)

Claim Two: Defendants violated Phoenix's rights under the Americans with Disabilities Act ("ADA") "due to staff not providing the necessary and prescribed hearing aids for his hearing loss . . . ." (ECF No. 38, at 19.)

Phoenix seeks monetary damages. (ECF No. 38, at 19.)

In response to the Motion for Summary Judgment filed by Defendants Harris, Sharma, Schnur, and Marinos, Phoenix filed several motions identical to motions filed in his other cases that have already been denied. As is his practice, Phoenix has disregarded the rules and the directives of the Court in these motions and in his Response. As discussed below in Part III, prior to turning to the merits of the Motion for Summary Judgment, the Court denies these repetitive motions. The Court concludes that Phoenix's recent motions are filed in bad faith, to harass Defendants, and as an attempt to stall his many cases that have been pending on the Court's docket for two and a half years. The Court addresses the motions along with his Response in Opposition to the Motion for Summary Judgment.

---

conditions may truly be considered serious, as discussed below, his hearing loss and tinnitus and his delay in receipt of two hearing aids does not reach that level.

[5] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).

In support of their Motion for Summary Judgment, Defendants submit: Phoenix's medical records (ECF No. 68-1); the declaration of Defendant Dr. Alvin Harris (ECF No. 68-2), who attests that the attached medical records are true and correct; the declaration of Defendant

Dr. Kshitij Sharma (ECF No. 68-3); the declaration of Defendant Jessica Schnur, RN (ECF No. 68-4); and, timeline or summary of Phoenix's interactions with Defendant APRN Steven Marinos (ECF No. 68-5).

### III. Phoenix's Response in Opposition and Later Filed Motions

As explained in its January 5th, 2026 Memorandum Opinion, the Court's evaluation of Phoenix's current case does not occur in a vacuum. Two years ago, the Court observed that although Phoenix is appearing *pro se*, "he is a sophisticated litigant." *Jamison v. Clark*, No. 3:22cv425, 2024 WL 251927, at *7 (E.D. Va. Jan. 23, 2024) ("*Jamison I*"). The Court observed that, "Jamison has an expansive history of unnecessarily protracting litigation by improper complaints and ignoring the Court's directions." *Id.* at *8. The Court found that Phoenix's "conduct in the present action alone stands as a testament to his inclination to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.* As explained below, in the present action, Phoenix continues his inclination "to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.*

#### A. Phoenix's Motions

As he has in many of his previous cases, Phoenix filed two Motions to Stay (ECF Nos. 82, 86), and a Motion for Discovery and Issuance of Subpoenas (ECF No. 84). The Court has already addressed these motions in different cases and found them filed in bad faith, to harass Defendants, and for dilatory reasons. *See Phoenix v. Herrick*, No. 3:23cv335, 2026 WL 781327, at *3–5 (E.D. Va. Mar. 19, 2026); *Phoenix v. Clarke*, No. 3:23cv276, 2026 WL 561197, at *3–6 & n.8 (E.D. Va. Feb. 27, 2026) (noting that "with respect to the identical motions filed in [his] other cases, the Court may, if appropriate, refer to this case and summarily deny the motions"). The Court need not reiterate those reasons again. Accordingly, for the reasons stated before, the

5

Motions to Stay (ECF Nos. 82, 86), and a Motion for Discovery and Issuance of Subpoenas (ECF No. 84) will be DENIED.

## B. Phoenix's Response and Declaration

At this stage, the Court must assess whether Phoenix "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Although Phoenix filed a Response to the Motion for Summary Judgment (ECF No. 75), it fails to comply with the rules governing such responses. As a preliminary matter, the Court understands that Phoenix is *pro se*; however, he is no longer incarcerated and therefore no longer faces the same impediments in accessing resources that he did as a prisoner. Moreover, Phoenix's submissions demonstrate that he is a sophisticated litigant. Although Phoenix's *pro se* status makes him "entitled to some deference," it does not relieve him of his duty to abide by the rules and orders of this Court. *Ballard v. Carlson*, 882 F.2d 93, 96 (4th Cir. 1989) (citation omitted). Over the course of the nineteen lawsuits filed in this division, the Court has had to repeatedly remind Phoenix of his obligation to follow the instructions provided by the Court and the rules of the Court. Phoenix has consistently disregarded the Court's orders. *See, e.g., Jamison v. Clark*, No. 3:22cv425, 2024 WL 251927, at *7–11 (E.D. Va. Jan. 23, 2024) (discussing Phoenix's "expansive history of unnecessarily protracting litigation . . . and ignoring the Court's directions" and the consequences of his repeated failure to comply with the Court's orders).

In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Rule 56(B) requires that:

6

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and *citing the parts of the record relied on to support the facts alleged to be in dispute*. In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added). In Phoenix's Response, he fails to *respond* to the Defendants' Statement of Undisputed Facts. Phoenix did not include a specifically captioned section listing "the relevant parts of the record relied on to support the facts alleged to be in dispute." *Id.* Instead, he offers his own unsupported narrative, and entitles it "STATEMENT OF UNDISPUTED GENUINE MATERIAL FACTS." (ECF No. 75, at 7.) Therefore, the Court can assume the remainder of facts identified by the Defendants in their list of material facts are admitted. E.D. Va. Loc. Civ. R. 56(B).[6]

Phoenix attached to his Response 585 pages of medical records, grievance material, correspondence, and other information. (ECF No. 75-2 through 75-4.) In his Response, however, Phoenix fails to provide any useful citation to individual documents. The Court is not obliged or inclined to sort through the record on summary judgment. *See Wimbush v. Wyeth*, 619 F.3d 632, 638 n.4 (6th Cir. 2010) (noting it is a party's "job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out"). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's

---

[6] The Court also notes that Phoenix's Response is 53 pages, which is 23 pages longer than the Local Rules permit. E.D. Va. Local Civil R. 7(F)(3). Nevertheless, the Court will consider the Response where appropriate despite Phoenix's clear disregard of this limit.

opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Rather, "[t]he court need consider only the cited materials . . . ." Fed. R. Civ. P. 56(c)(3); *see Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (alterations in original) (observing that "[j]udges are not like pigs, hunting for truffles buried [in the record]" (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010))). Thus, these materials are of little use in deciding the propriety of summary judgment.

Finally, Phoenix's Response is rambling, repetitive, and because of that, is unnecessarily lengthy. Phoenix adds stray remarks that suggest new theories of liability such as claiming that Defendants violated Virginia Department of Corrections ("VDOC") policies (*see, e.g.*, ECF No. 75, at 21–26), and drops asides that sound in negligence, such as Defendants were not reasonably prudent. (*See, e.g.*, ECF No. 75, at 40, 42, 49.) However, Phoenix may not add new claims or allegations in a responsive brief. *See Hurst v. Dist. of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) (noting that "a plaintiff may not amend [his or] her complaint via briefing" (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988); *Car Carriers Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984))); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 847 F. Supp. 2d 843, 851 n.9 (E.D. Va. 2012); *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 111 (W.D. Va. 2007) (citations omitted) (explaining that "new legal theories must be added by way of amended pleadings, not by arguments asserted in legal briefs"). To the extent Phoenix attempts to bring new claims, they cannot and will not receive further consideration here.

In his Response, Phoenix indicates that he "attached his declaration in support of this response to the defendant's motion for summary judgment in Attachment III." (ECF No. 75, at 52.) The Court initially reviewed Phoenix's abundant attachments and found no declaration. Accordingly, by Memorandum Order entered on March 5, 2026, the Court provided Phoenix

8

with an opportunity to submit the declaration. (ECF No. 91.) In response, Phoenix filed a newly drafted Declaration. (ECF No. 92.)[7]

The facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). The sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

In his Declaration, Phoenix puts forth numerous sworn statements that are of no value in assessing the propriety of summary judgment. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) ("[a]iry generalities, conclusory assertions[,] and hearsay statements [do] not suffice to stave off summary judgment"). For example, Phoenix offers that the hearing test onsite was conducted by "an[] unlicensed audiologist" and that the hearing aid he was provided was "improper" in a wholly unsupported and conclusory fashion. (ECF No. 92 ¶¶ 7, 9); *see Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (explaining that a nonmoving party cannot "create a genuine issue of material fact through mere speculation" (citation omitted)). Clearly, Phoenix is not a medical professional and is not competent to provide a medical opinion. Fed. R. Civ. P. 56(c)(4); *see Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (holding that prisoner "[w]holly lacking in medical knowledge" may not give expert medical testimony). Statements such as these will not

---

[7] Phoenix's Declaration is properly sworn. However, the Complaint is not sworn to under penalty of perjury and is not evidence. Phoenix swore under penalty of perjury only to his certificate of service attached to the Complaint. (ECF No. 38, at 20.)

be considered.[8]  Finally, the end of his Declaration is nothing more than his repeated complaint that he has not been able to conduct discovery, which is not true.  (ECF No. 92, at 4.)  While Phoenix was not permitted to file motions with the Court until he was granted *in forma pauperis* status, he was free to seek discovery from Defendants once they had been served.  Although he has sought discovery in other cases, he did not do so in this matter.

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment.  All permissible inferences are drawn in favor of Phoenix.

### IV.  Summary of Relevant Facts

As a preliminary matter, the medical record is generally not contested by Phoenix.[9] Rather, Phoenix believes that Defendants failed to provide him with two hearing aids as quickly as he demanded and disagreed with Defendants' medical decisions.  Despite Phoenix's apparent dissatisfaction with the timing of his treatment, however, the record amply reflects that Phoenix received constitutionally adequate medical care for his hearing loss and tinnitus.

### A.  Treatment for Hearing Loss and Tinnitus

Dr. Alvin Harris is the former Medical Director of DCC, a role that was both administrative and clinical.  (ECF No. 68-2 ¶¶ 7–8.)  Dr. Harris provided direct patient care to Phoenix "and in so doing, [he] would have and did review clinical notes made by other members of the healthcare team including outside consultants."  (ECF No. 68-2 ¶ 8.)   Phoenix arrived at DCC on August 2, 2019.  (ECF No. 68-2 ¶ 6.)  Phoenix received treatment for a host of medical

---

[8] Nevertheless, the Court explains why some of these statements lack evidentiary value in footnotes.

[9] Phoenix was seen in the medical department for many ailments.  The Court does not recite every instance where Phoenix saw Dr. Harris, Dr. Sharma, or APRN Marinos.

issues, "including anxiety, asthma, celiac disease, GERD, Barrett's esophagus, several food allergies, dermatitis, high blood pressure, an enlarged prostate, irritable bowel syndrome, obesity, chronic headaches, hearing loss, hemorrhoids, depression, diabetes, post-traumatic stress disorder, and Sjogren's disease." (ECF No. 68-2 ¶ 9.)[10] Dr. Harris "personally saw [Phoenix] extensively and frequently for a myriad of different medical issues over the course of several years" and "[h]is various medical issues required frequent follow up and complex coordination." (ECF No. 68-2 ¶ 10.) Dr. Harris explains that although this "lawsuit only involves his hearing-related concerns" Phoenix "often . . . would be seen in the clinic for multiple concerns at the same time." (ECF No. 68-2 ¶ 11.)

Prior to Dr. Harris's involvement with Phoenix, the medical records reflect that on December 24, 2019, a provider who is not a defendant noted that she saw Phoenix for "ear/back/neck pain/med renewal/podiatry/GI appt." (ECF No. 68-2 ¶ 12.a.) Phoenix reported ringing in his left ear, which he had experienced for years, and decreased hearing. (ECF No. 68-2 ¶ 12.a.) The provider placed a referral for an "ENT audiology." (ECF No. 68-2 ¶ 12.a.)

On March 11, 2020, Dr. Harris first saw Phoenix for a variety of complaints unrelated to his ear but he also reported, "left ear ringing for 2 years." (ECF No. 68-2 ¶ 13; ECF No. 68-1, at 4.) That same day Dr. Harris placed a "specialist referral to Commonwealth ENT" that was "scheduled for April 24 (date set by the offsite provider)," for Phoenix's chief complaint of tinnitus or "ringing in left ear history of two years." (ECF No. 68-2 ¶ 13.) Soon thereafter, offsite appointments were cancelled because of the COVID-19 pandemic, and Nurse Schnur informed Phoenix of the cancellation of offsite appointments on May 5, 2020. (ECF No. 68-2

---

[10] The Court omits the secondary citations to the medical record.

¶ 13.) As of October 22, 2020, the medical record reflects that staff at DCC were still awaiting a rescheduled ENT appointment for Phoenix. (ECF No. 68-1, at 5.)[11]

On September 2, 2021, Phoenix complained of sinusitis. (ECF No. 68-2 ¶ 13.) Dr. Harris first referred Phoenix to a consulting physician who upon examination of Phoenix noted that he had "[l]eft sensorineural hearing loss" and "[i]nferior turbinate hypertrophy," and as treatment, prescribed Flonase. (ECF No. 68-1 ¶ 13.) Dr. Harris also placed a referral to VCU ENT. (ECF No. 68-2 ¶ 13.) On November 3, 2021, Phoenix had his first appointment with a doctor at VCU's Department of Otolaryngology for left ear hearing loss and tinnitus, and the doctor noted that Phoenix reported that he had "[n]o issues with [his] right ear." (ECF No. 68-1, at 26.) Phoenix told the doctor that "he also has a history of headaches/migraines and does not feel that his ear complaints are related" and that he experienced dizziness and had "been told by multiple providers that it is related to his Celiac's disease." (ECF No. 68-1, at 26.) The doctor discussed with Phoenix that his hearing loss "likely due to noise exposure," recommended a consult to audiology, recommended hearing aids, discussed their limitations and benefits, and recommended a repeat audiogram with an audiologist in one year. (ECF No. 68-1, at 27.) The doctor also noted that tinnitus may improve with hearing aids. (ECF No. 68-7, at 27.)

Dr. Kshitij Sharma also served as a primary care physician at DCC until June 22, 2022. (ECF No. 68-3 ¶¶ 1–3.) Dr. Sharma also saw Phoenix for multiple medical issues when he worked at DCC; however, his involvement with Phoenix pertaining to his hearing loss was limited. (ECF No. 68-3 ¶¶ 8–9.) On November 5, 2021, Dr Sharma reviewed the notes for Phoenix's appointment with VCU and ordered hearing aids. (ECF No. 68-3 ¶ 13.)[12] On

---

[11] According to Phoenix, as of June 16, 2021, DCC medical informed him that they were still awaiting an appointment to be scheduled by the outside provider. (ECF No. 38, at 12.)

[12] Clearly, hearing aids were not ordered at this time and the record does not reflect why.

November 17, 2021, Dr. Harris requested a referral for otology/neurotology for Phoenix to be evaluated for hearing aids. (ECF No. 68-2 ¶ 13.)

On January 24, 2022, Dr. Sharma again noted that Phoenix needed an "audiology eval and hearing aids." (ECF No. 68-3 ¶ 9.) On February 2, 2022, Phoenix was tested for hearing aids. (ECF No. 68-3 ¶ 9.) The audiologist reported:

> hearing was within normal limits in the low frequencies sloping to a moderate/severe-severe loss in the mid to high frequencies in both ears. The pt will have trouble with communication difficulties without amplification in all settings. Pt is a candidate for a left hearing aid based on degree of hearing loss in that ear.

(ECF No. 68-3 ¶ 9.)[13] On February 14, 2022, Dr. Harris approved ordering Phoenix one hearing aid based on the testing. (ECF No. 68-2 ¶ 13.) On March 2, 2022, Phoenix signed for and received the hearing aid. (ECF No. 68-2 ¶ 13.) Dr. Sharma had no further contact with Phoenix after he left the facility on June 22, 2022. (ECF No. 68-3 ¶ 13.)

Although APRN Marinos saw Phoenix for many health issues beginning in June of 2022, the first time Phoenix complained to APRN Marinos about his hearing or tinnitus was on August 9, 2022, during the chronic disease clinic, when he noted "ringing in his ears," among other more severe problems. (ECF No. 68-5, at 2.) APRN Marinos noted that Phoenix had been "[r]eferred to VCU for [his] ears." (ECF No. 68-5, at 2.) On August 23, 2022, APRN Marinos saw Phoenix for left elbow pain, noted that the MRI had been conducted and the referral to the ENT was complete. (ECF No. 68-5, at 3.)

---

[13] Phoenix asserts, based on his own unsubstantiated belief, that this audiology test was not adequate because it was "comprised of an IPAD with headphones." (ECF No. 92 ¶ 7.) Phoenix is not competent to determine whether a medical test is appropriate or proper. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001). Nevertheless, this audiology exam clearly had results consistent with what the doctor found that Phoenix had hearing loss and that it was severe enough in his left ear to warrant a hearing aid. It is important to note that, at this juncture in February of 2022, only a single hearing aid for Phoenix's left ear was prescribed.

On October 17, 2022, Nurse Schnur held a telephone conference with Phoenix where they discussed seven different health issues. (ECF No. 68-4 ¶ 13.b; ECF No. 68-2 ¶ 13.) Nurse Schnur noted that Phoenix saw an ENT doctor on November 30, 2021, who recommended an audiogram and an audiology referral, and that hearing aids were recommended, but the onsite audiology testing only recommended one hearing aid. (ECF No. 68-4 ¶ 13.) Phoenix told Nurse Schnur that "this is not helping with his hearing." (ECF No. 68-4 ¶ 13.)[14] Nurse Schnur noted that the VCU audiologist had recommended a one-year follow-up audiogram (ECF No. 68-2 ¶ 13), and that she planned to follow-up with medical providers and then Phoenix about that appointment. (ECF No. 68-4 ¶ 13.)

The following day, on October 18, 2022, Dr. Harris and APRN Marinos discussed many issues with Phoenix including an MRI for leg numbness, biceps repair surgery, a podiatry appointment, a need for orthotic boots, and the hearing aid and audiogram. (ECF No. 68-2 ¶ 13; ECF No. 68-5, at 3.) Dr. Harris noted that the "[p]lan was to see if the audiogram could be done onsite, cancel VCU appt, but that [Phoenix] could go to VCU if this cannot be done onsite." (ECF No. 68-2 ¶ 13.) APRN Marinos noted that a referral was placed to VCU audiology, and Phoenix was referred to an orthopedist for his arm pain. (ECF No. 68-5 ¶ 13.)

On November 2, 2022, Phoenix was referred for an appointment with onsite audiology at the recommendation of the Regional Director. (ECF No. 68-5 ¶ 4.)

---

[14] In his Declaration, Phoenix indicates that the "hearing aid did not help the tinnitus as it was unprogrammable" and that "[t]his improper hearing aid cause[d] hearing issues and often did not work properly," and that "staff had to send away for another hearing aid, which was also determined to be ineffective." (ECF No. 92 ¶ 9.) Other than Defendant Schnur, Phoenix fails to identify to whom he expressed these opinions with any specificity. From Phoenix's own statements, it is evident that unidentified medical staff were working with Phoenix to try to address his hearing needs, his tinnitus, and to obtain a working hearing aid.

On January 5, 2023, Phoenix attended an interdisciplinary team meeting with DCC medical staff including Nurse Schnur. (ECF No. 68-2 ¶ 13.) Phoenix complained about his "neck, back, and shoulder . . . neuropathy in [his] hands and feet" and "also complain[ed] of ENT recommendations not being followed and request[ed] to go to VCU audiology." (ECF No. 68-2 ¶ 13.) Relevant here, Nurse Schnur noted her plan was to "discuss referral to VCU audiology to follow up on continued hearing issues." (ECF No. 68-4 ¶ 13.)

On January 25, 2023, Phoenix had the recommended one-year follow-up audiology evaluation at VCU. (ECF No. 68-2 ¶ 13.) This was his second examination by an audiologist. Phoenix

> stated he still has tinnitus and hearing may have decreased slightly. Pt stated he was given a hearing aid for the LE. Stated he feels off balance with only one hearing aid. Pt would like 2 hearing aids for better clarity and localization. Eval shows hearing is stable compared to results from 11/3/2021. Recommended ENT eval due to tinnitus, vertigo.

(ECF No. 68-2 ¶ 13.)[15] Phoenix indicated that he had recurring ear pain and that he only wore his left ear hearing aid "on occasion due to it feeling off balance with hearing." (ECF No. 68-1, at 34.) The audiologist also noted that Phoenix's "[w]ord recognition was excellent at a comfortable listening level." (ECF No. 68-1, at 34.) Based on the audiologist's recommendation, on February 1, 2023, Dr. Harris approved a referral to VCU ENT for Phoenix's complaints of tinnitus. (ECF No. 68-2 ¶ 13.)

---

[15] Phoenix suggests that, "[l]ate in 2023," "it was again determined that my hearing at further diminished." (ECF No. 92 ¶ 11.) It is unclear whether Phoenix refers to this appointment. However, Phoenix's statement is belied by the record, the medical records quoted above show that the doctor determined his "hearing [was] stable." (ECF No. 68-2 ¶ 13.) Even at his appointment with VCU ENT on October 19, 2023, the record does not reflect any notation that his hearing had declined. (*See* ECF No. 68-2 ¶ 13.)

On April 12, 2023, Phoenix had his second appointment with VCU ENT. (ECF No. 68-2 ¶ 13.) The doctor noted that Phoenix had tinnitus that was greater in the left ear than in the right ear. (ECF No. 68-2 ¶ 13.) The doctor also indicated that Phoenix complained of dizziness, and vestibular migraines and "[r]ecommended [an] MRI, bilateral hearing aids, and neurology for headaches/vertigo." (ECF No. 68-2 ¶ 13.)[16] Dr. Harris referred Phoenix for an MRI, a neurology appointment, and a follow up with VCU ENT. (ECF No. 68-2 ¶ 13.) On June 7, 2023, Phoenix had a brain MRI offsite for "sensori-neural hearing loss" and the results were normal. (ECF No. 68-2 ¶ 13.) On October 18, 2023, Phoenix had an appointment with VCU neurology for primary complaints of "neck pain, right leg pain, and left shoulder pain." (ECF No. 68-2 ¶ 13 (emphasis omitted).) On October 19, 2023, Phoenix had a third appointment at VCU ENT. (ECF No. 68-2 ¶ 13.) Phoenix selected new hearing aids and was to return to audiology for a fitting after they were authorized by the VDOC. The provider noted that Phoenix had "[n]o restrictions," and that his follow up appointment was TBD. (ECF No. 68-2

_____

[16] Phoenix suggests that "tinnitus caused sever[e] headaches" and he had "horrible headaches due to the hearing loss and tinnitus." (ECF No. 92 ¶¶ 3, 13.) Phoenix is not competent to provide a medical opinion that tinnitus was the cause of his headaches. *See Pearson*, 237 F.3d at 886. Additionally, Phoenix consistently complained of chronic headaches independent of his complaints of hearing loss and tinnitus and was prescribed pain medications. (ECF No. 68-1, at 11, 14; ECF No. 68-2 ¶ 9; ECF No. 68-5, at 2). Tellingly, prior to his response to the first Motion to Dismiss, Phoenix did not attribute his headaches to tinnitus or hearing loss. (*See* ECF No. 78, at 17 n.14 (citing ECF No. 62, at 10).) Phoenix previously attributed the headaches to eating foods with gluten and celiac disease. *See Jamison v. Clarke*, No. 7:18-cv-00504, 2021 WL 969201, at *2 (W.D. Va. Mar. 15, 2021). At his appointment with VCU ENT on November 3, 2021, Phoenix specifically told the doctor that "he has a history of headaches/migraines and does not feel that his ear complaints are related." (ECF No. 68-1, at 26.) Moreover, at a meeting with Nurse Schnur on October 17, 2022, Phoenix complained of "[h]eadaches and dizzy spells" and "report[ed] this may be related to his neck/back pain or diet." (ECF No. 68-1, at 11.) Phoenix "[r]eported to [Nurse Schnur] that his headaches and dizzy spells are not new and has [had] since his entry to DOC." (ECF No. 68-1, at 11.) Therefore, in addition to Phoenix not being competent to provide a medical opinion, Phoenix's current statement that tinnitus caused him severe headaches is not entitled to a presumption of truth because it conflicts with the contemporaneous record.

16

¶ 13.) After this exam, according to Phoenix, "medical personnel put the prescription in my file and never ordered the hearing aids." (ECF No. 92 ¶ 12.)[17]

On December 15, 2023, Phoenix saw Dr. Stich, who is not a Defendant, for unrelated breathing issues and Phoenix did not bring up any issues with his hearing. (ECF No. 68-3 ¶ 13.) Dr. Stich conducted a comprehensive assessment of Phoenix and a review of his medications and Phoenix "refused the recommended treatment." (ECF No. 68-2 ¶ 13.) On January 9, 2024, Phoenix was transferred to St. Bride's Correctional Center meaning that Dr. Harris, APRN Marinos, and RN Schnur had no further contact or involvement with Phoenix. (ECF No. 68-2 ¶ 13, ECF No. 68-4 ¶ 16.)

In his Declaration, Phoenix suggests that "[w]ith the overwhelming noise in the dorms and around the facility, it was hard for me to hear" and that he "missed a lot of conversations." (ECF No. 92 ¶¶ 3, 13.)

## B. Nurse Schnur's Involvement in Phoenix's Care

### 1. Nurse Schnur's Rule was Administrative

Nurse Schnur was the Healthcare Services Administrator ("HSA") at DCC during the time Phoenix was incarcerated in that facility. (ECF No. 68-4 ¶ 8.) Despite Phoenix's insistence that Nurse Schnur failed to "make corrections to [his] prescribed care as was her duty," (ECF No. 92 ¶ 15), as the HSA, that was not her role.[18] Instead, her role

---

[17] Phoenix received two hearing aids on January 23, 2024, three months after he selected a pair. (ECF No. 38, at 6.) Phoenix now contends that "once [he] received the proper programmable hearing aids, [he] was able to hear properly and they helped calm the tinnitus down, so [he] did not have such bad headaches." (ECF No. 92 ¶ 3.) However, the record reflects that Phoenix never attributed his headaches to tinnitus until his response to the Motion to Dismiss filed in July of 2025. (*See* ECF No. 62, at 10; ECF No. 68, at 17 n.14.)

[18] In his Response, Phoenix argues that when he first arrived at DCC, Nurse Schnur provided direct patient care. (ECF No. 75, at 9.) Phoenix fails to submit admissible evidence of this alleged fact or how and when she provided care for his hearing loss or tinnitus.

was administrative, not clinical.  In this role, [she] provided administrative oversight of the medical services at DCC, which included overseeing healthcare staffing needs at DCC, coordinating resources involved in the delivery of healthcare, ensuring compliance with applicable regulations affecting the delivery of healthcare at DCC, and coordinating inmate medical services involving various disciplines.

(ECF No. 68-4 ¶ 8.)  Nurse Schnur explains that her "position did not involve direct patient care." (ECF No. 68-4 ¶ 9.)  Although Nurse Schnur is a registered nurse, "in the chain of command, the nursing staff report to the Director of Nursing.  [She was] not their supervisor as [her] role [was] administrative." (ECF No. 68-4 ¶ 10.)  As a nurse, Nurse Schnur did not and could not "make medical diagnoses" or "order diagnostic imaging studies, medications, make referrals, or make a determination on whether particular intervention was needed." (ECF No. 68-4 ¶ 11.)  Moreover, "[t]reatment decisions [were] outside the scope of practice for a nurse and [she] did not make treatment decisions for" Phoenix. (ECF No. 68-4 ¶ 11.)

### 2. Nurse Schnur Coordinated Meetings

Nurse Schnur explains that she had indirect involvement with Phoenix while he was housed at DCC and "all those occasions involved the coordination of multidisciplinary team meetings between [Phoenix] and the various members of the healthcare treatment team." (ECF No. 68-4 ¶ 12.)  Nurse Schnur avers that she was involved in three multidisciplinary team meetings for Phoenix on October 22, 2020, October 17, 2022, and January 5, 2023. (ECF No. 68-4 ¶ 13.)

In addition to the October 17, 2022 and January 5, 2023 meetings described previously, during the October 22, 2020 multidisciplinary meeting, Nurse Schnur noted that Phoenix "reported need for ENT, dermatology, colonoscopy, podiatry, neurosurgery, etc." and "[m]ultiple issues were reviewed" during the meeting. (ECF No. 68-4 ¶ 13.)  Nurse Schnur noted that

several appointments including the ENT appointment were on hold due to the COVID-19 pandemic. (ECF No. 68-4 ¶ 13.)

### V.  Analysis of Eighth Amendment Claim (Claim One)

#### A.  Eighth Amendment Principles

To survive summary judgment, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

In the context of delayed medical care, the objective-prong analysis does not end there. In addition to demonstrating that a medical need that was objectively serious, a plaintiff must also establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. 2012) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate

indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

20

Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977). Thus, "[t]he Eighth Amendment's prohibition on cruel and unusual punishment is not violated when a doctor simply resolves 'the question whether additional diagnostic techniques or forms of treatment [are] indicated.'" *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (quoting *Estelle*, 429 U.S. at 107).

## B. Phoenix Fails to Satisfy the Objective Prong

In Claim One, Phoenix argues that Defendants violated his Eighth Amendment rights "for their actions . . . on not making corrections to the violations" and "for not providing medical care or medical aids for his serious medical condition of hearing loss and tinnitus . . . ." (ECF No. 38 ¶ 57; *see id.* at 14–19).[19] The Court already concluded that Phoenix failed to allege facts that plausibly suggest that his hearing loss and tinnitus were sufficiently serious medical needs. In finding Phoenix failed to satisfy the objective prong of the Eighth Amendment analysis the Court explained:

> The failure to provide basic corrective devices may amount to deliberate indifference to a serious medical need. *See Newman v. Alabama*, 503 F.2d 1320, 1331 (5th Cir. 1974) (noting that a prison's alleged failure to provide "eyeglasses and prosthetic devices" may contribute to an Eighth Amendment claim). The United States Court of Appeals for the Fourth Circuit has held that "under [the] appropriate circumstances the refusal to supply a hearing aid to a convict could

---

[19] Defendants argue that they "do not believe the evidence supports a finding that [Phoenix's] condition was sufficiently serious for purposes of the constitutional analysis, but will assume *arguendo*, that the Court could make that conclusion without admitting or conceding it." (ECF No. 68, at 19.)

constitute deliberate indifference to a serious medical need." *Large v. Wash. Cty. Det. Ctr.*, No. 90–6610, 1990 WL 153978, at *2 (4th Cir. Oct. 16, 1990). However, "not all hearing loss amounts to a serious medical condition." *Gilmore v. Hodges*, 738 F.3d 266, 276 (11th Cir. 2013). Indeed, "if a plaintiff can carry on a normal conversation and hear and follow directions without the use of a hearing aid, a court would be hard pressed to classify the plaintiff's impairment as a serious medical need." *Id.* at 276–77 (citations and internal quotation marks omitted).

Phoenix fails to allege facts to satisfy the objective prong of the Eighth Amendment inquiry. As noted above, while hearing loss and tinnitus might plausibly result in a sufficiently serious harm under the Eighth Amendment, Phoenix fails to allege any such injury here. *See Hanrahan v. Mennon*, 470 F. App'x 32, 33 (2d Cir. 2012) (explaining that a condition is sufficiently serious if it is "a condition of urgency, one that may produce death, degeneration, or extreme pain") (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Although Phoenix attempts to obscure this detail, Phoenix was provided with one hearing aid in 2022. Indeed, Phoenix alleges no facts indicating that he suffered any injury, much less a serious or significant injury, from Defendants' failure to provide him with two hearing aids. Tellingly, at most, Phoenix vaguely states that due to the Defendants' actions, he "suffered further hearing loss and further increased tinnitus causing headaches." (ECF No. 38, at 18.)[20] In addition, Phoenix outlines many meetings that he had with Defendants to discuss his medical treatment, identifies at least fifty-five medical appointments, and at no time indicates that he experienced problems conversing or communicating in the meetings or appointments. *Cf. Gilmore*, 738 F.3d at 276–77 ("[I]f a plaintiff can 'carry on a normal conversation' and hear and follow directions without the use of a hearing aid, a court would be hard pressed to classify the plaintiff's impairment as a serious medical need" (citations omitted)); *Chacon v. Ofogh*, No. 7:08cv46, 2008 WL 4146142, at *9–10 (W.D. Va. Aug. 21, 2008) (explaining that the ability to "carry on a normal conversation" . . . suggests . . . that [plaintiff's] hearing is not so impaired as to rise to the level of a serious medical need" (citation omitted).). Nor does the fact that an audiologist recommended or prescribed two hearing aids, standing alone, turn hearing loss or tinnitus into a serious or significant medical need. *See Chacon*, 2008 WL 4146142, at *4 (citing *Large*, 1990 WL 153978, at *2).

Moreover, from his Amended Complaint, it is evident that Phoenix was seen and examined many times for his hearing loss and tinnitus, (*see, e.g.*, ECF No. 38 ¶ 10), was provided with one hearing aid in 2022 (ECF No. 38 ¶ 8; *see* ECF No. 1, at 8), and received two hearing aids on August 22, 2024. (ECF No. 38, at 7.) Therefore, Phoenix's Eighth Amendment claim truly arises from the delay in his receipt of two hearing aids. However, Phoenix also alleges no significant adverse effects from the delay in receiving two hearing aids. *See Mata*, 427 F.3d at 751. At most, as stated above, Phoenix indicates that he "suffered further hearing

---

[20] In his response to the Motion to Dismiss, Phoenix claims for the first time that "tinnitus . . . was the cause of several earaches and horrible headaches." (ECF No. 62, at 10.) Phoenix may not raise new factual allegations in a response to a Motion to Dismiss that he failed to allege in his Amended Complaint to escape dismissal of his claim.

22

loss and further increased tinnitus causing headaches." (ECF No. 38, at 18.) This is insufficient to plausibly suggest that he suffered any substantial harm from the delay in receiving two hearing aids. Thus, Phoenix fails to allege facts indicating that the delay in receipt of two hearing aids itself caused him substantial harm. *See Webb*, 281 F. App'x at 166 (explaining that an "Eighth Amendment violation only occurs . . . if the delay results in some substantial harm"); *Shabazz*, 2012 WL 442270, at *5 (explaining that substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain.") In sum, because Phoenix alleges no serious or significant injury, he fails to satisfy the objective prong of the Eighth Amendment inquiry. For this reason alone, Phoenix's claim of denial of adequate medical care against Defendants will be DISMISSED for failure to state a claim.

*Phoenix*, 2026 WL 21754, at *9–10.

On this record, Phoenix fails to show a serious medical need that required the immediate receipt of two hearing aids. The mere fact that VCU ENT twice opined—in November of 2021 and in April of 2023—that Phoenix could benefit from two hearing aids does not necessarily suffice to eventually turn his hearing loss and tinnitus into a sufficiently serious medical need. *See Large*, 1990 WL 153978, at *2. Rather, the Court must examine all "circumstances under which the alleged refusal to provide . . . hearing aid[s] occurred." *Id.* In doing so, it is evident that Phoenix cannot carry his burden at trial.

As the Court has previously noted, after the filing of the previous Motion to Dismiss, and again in his Declaration, Phoenix adds that "tinnitus caused sever[e] headaches." (ECF No. 92 ¶ 3.) As explained previously, Phoenix is not competent to provide a medical opinion that tinnitus was the cause of his headaches or that hearing aids would resolve his headaches. Moreover, the contemporaneous medical record reflects that Phoenix specifically disavowed that his headaches were from problems with his ears and instead believed that they were from neck and back pain and his diet. (ECF No. 68-1, at 11, 26.) Phoenix also contends, for the first time, that "[w]ith the overwhelming noise in the dorms and around the facility, it was hard for me to hear" and that he "missed a lot of conversations" (ECF No. 92 ¶¶ 3, 13.) However, neither

Phoenix nor the record suggests that he was unable to "carry on a normal conversation and hear and follow directions" prior to his receipt of two hearing aids. *Gilmore*, 738 F.3d 276–77. Thus, Phoenix has failed to demonstrate that he had a serious medical need for hearing aids. *Id.*; *see Patterson v. Smith*, No. 1:20CV202, 2020 WL 6928614, at *8 n.12 (E.D. Va. Nov. 24, 2020) (noting that where there is no "impairment in communication" there is a "medical basis for not approving the recommended hearing aids" suggested by an outside audiologist (internal quotation marks and citation omitted)).

Similarly, Phoenix has failed to submit admissible evidence to demonstrate that his tinnitus created a serious medical need for two hearing aids. *Cf. Davidson v. Scully*, 155 F. Supp. 2d 77, 84 (S.D.N.Y. 2001) (holding that a reasonable juror could not "find that tinnitus is a serious medical need under the Eighth Amendment," because, *inter alia*, "it does not produce pain at all" (internal quotation marks omitted)).[21] Where an inmate's hearing is "functional," as Phoenix's appears to be, there mere fact that the inmate also has tinnitus does not necessitate the provision of hearing aids or the immediate provision of two hearing aids rather than one. *See Cooper v. Johnson*, 353 F. App'x 965, 967–68 (5th Cir. 2009) (affirming summary judgment were defendants "refused to give [plaintiff] a hearing aid to relieve [his] tinnitus").[22] On this record, Phoenix had failed to show a serious medical need that required immediate receipt of two hearing aids. As Phoenix has failed to demonstrate a serious or significant injury, he again fails to satisfy the objective prong of the Eighth Amendment. For this reason alone, Claim One against all of the Defendants will be DISMISSED WITH PREJUDICE.

---

[21] At most, Phoenix belatedly suggests that tinnitus caused severe headaches. However, as explained before, Phoenix previously disavowed that his headaches were from anything related to his ears.

[22] Here, Phoenix was provided with a hearing aid for his complaints of tinnitus or ringing in his left ear.

## C. **Phoenix Fails to Satisfy the Subjective Prong**

Even if Phoenix had demonstrated that his hearing loss and tinnitus amounted to a serious medical need, which he has not, Phoenix also does not establish that Dr. Harris, Dr. Sharma, APRN Marinos, or Nurse Schnur were deliberately indifferent to those needs. "Once prison officials are aware of a serious medical need, they only need to "respond[] reasonably to the risk." *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021) (alteration in original) (citing *Farmer*, 511 U.S. at 844). The record makes clear that Dr. Harris and Dr. Sharma provided a reasonable response to Phoenix's complaints of hearing loss and tinnitus. Neither doctor ignored Phoenix's complaints. Instead, they repeatedly provided Phoenix with referrals to outside specialists and to audiologists, ordered him one hearing aid, and when Phoenix complained that one hearing aid was not satisfactory, they sent him out for more specialist examinations and an MRI. Phoenix had two audiology examinations and had four referrals to VCU specialists including VCU ENT and a neurologist. At the base of his claim, Phoenix disagrees with the timing of his receipt of two hearing aids, which fails to support a claim of deliberate indifference.

### 1. **Dr. Sharma**

While Dr. Sharma treated Phoenix for a myriad of other ailments, his involvement with Phoenix for his hearing loss and tinnitus was limited. Dr. Sharma merely reviewed notes from the outside specialist in November 2021 and, pursuant to the notes, ordered Phoenix hearing aids. Apparently, that request was not approved. Dr. Sharma made a follow-up note in January 2022, that Phoenix needed to be referred for an audiology exam, which happened the following month. Dr. Sharma left DCC in June of 2022. Nothing in the record reflects that Dr. Sharma knew of and ignored a serious risk of harm to Phoenix through his limited interactions with Phoenix for his complaints of hearing loss and tinnitus. Moreover, as discussed below, Phoenix

fails to show that the provision of hearing aids was medically necessary.[23]  Claim One against Dr. Sharma will be DISMISSED WITH PREJUDICE.

### 2. **Dr. Harris**

As noted earlier, Phoenix wanted to receive two hearing aids on a more expedited basis. However, an inmate's disagreement with medical personnel with respect to a course of treatment is generally insufficient to state a constitutional claim.  *Wright*, 766 F.2d at 849 (citation omitted).  Also, in assessing a claim of deliberate indifference, the Court must consider the totality of medical care provided, rather than simply the additional treatment the inmate was denied. *See Walkers v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999)).  When Phoenix complained of hearing loss and ringing in his ear in 2020, Dr Harris referred him for an outside specialist appointment.  That appointment was canceled and not rescheduled for a long period of time due to the COVID-19 pandemic.[24] Neither Phoenix nor the record suggest that Phoenix complained about his hearing to Dr. Harris again until November 2021.  When Phoenix next complained of sinusitis in 2021, Dr. Harris

---

[23] And, as already established, Phoenix failed to show that the delay in receipt of two hearing aids resulted in substantial harm.

[24] Even without the disruptions from COVID-19 on elective care, to the extent there were delays in scheduling appointments with specialists:

> Medical care is often not immediate.  Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital.  Waiting is often the name of the game.  And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis.  It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.

*Moskos v. Hardee*, 24 F.4th 289, 297–98 (4th Cir. 2022).

referred Phoenix to a consulting physician who noted his hearing loss, and Dr. Harris then referred Phoenix to an outside specialist who recommended a referral to audiology, two hearing aids, and a follow-up with audiology in one year. At the recommendation of the specialist, Dr. Harris ordered Phoenix to have an audiology exam that was conducted onsite. The audiologist recommended one hearing aid for Phoenix's left ear hearing loss. Dr. Harris ordered the hearing aid for Phoenix. Again, the fact that the specialist may have recommended two hearing aids does not change the analysis. *See Jackson v. Lightsey*, 775 F.3d 170, 178–79 (4th Cir. 2014) (holding plaintiff fails to show deliberate indifference where non-specialist prison provider diagnosed inmate with less serious condition than outside specialist and deviated from the treatment recommended by specialist). The law plainly establishes that disagreements among medical providers about a patient's care do not generally rise to the level of deliberate indifference. *See Fitzgerald v. Corrs. Corp. of Am.*, 403 F.3d 1134, 1142 (10th Cir. 2005) (observing that "a medical difference of opinion . . . is not actionable under the Eighth Amendment"); *see also Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (finding that a difference of opinion between providers is insufficient to show deliberate indifference); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (noting that a provider is not indifferent to a plaintiff's needs simply by reaching a different diagnosis than another provider). In this instance, even though the recommendation to order two hearing aids from VCU ENT may align with Phoenix's view of the proper level of treatment, at its root, the claim against Dr. Harris is still nothing more than a dispute with a prison doctor over the proper level of care. *See Lightsey*, 775 F.3d at 178 (citations omitted); *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (explaining that "[i]t is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment").

27

Instead of ignoring Phoenix's hearing loss and tinnitus, when Phoenix complained that one hearing aid was not helping, Dr. Harris ensured that Phoenix was sent to the outside audiologist for his one-year follow-up and then referred him to VCU ENT. During that exam, the audiologist noted that Phoenix's hearing was stable. Although the ENT again recommended hearing aids, he also recommended an MRI and a referral to neurology for Phoenix's complaints of vestibular migraines, headaches, and dizziness. Dr. Harris ensured that Phoenix received the MRI and was sent out to see a neurologist to address his headaches and dizziness. Based on the record, a reasonable juror could not find that Dr. Harris was deliberately indifferent to Phoenix's ongoing complaints about his hearing loss and tinnitus.

Finally, Phoenix's claim is one for delay of medical treatment, not outright denial of medical treatment, because he ultimately received both hearing aids. Thus, he was required to show that "the delay result[ed] in some substantial harm" to him, such as a noticeable exacerbation of his symptoms. *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (emphasis and citations omitted). Phoenix has failed to point to any admissible evidence to support such a conclusion. Rather, the record evidence indicates the opposite. At his one-year follow-up appointment with VCU audiologist in November 2022, the audiologist noted: "Eval shows hearing is stable compared to results from 11/3/2021." (ECF No. 68-3 ¶ 9.) Thus, Phoenix fails to to show that any delay he may have experienced in two obtaining hearing aids resulted in a worsening of his condition. *Formica*, 739 F. App' at 755.

In sum, even if Phoenix could establish that he had a serious medical need that required two hearing aids, which he has not, he has not put forth admissible evidence that Dr. Harris was deliberately indifferent to that need. In the end, based on this record, no jury reasonably could find that Dr. Harris's exercise of medical judgment was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896

28

F.2d at 851.  Accordingly, Claim One against Dr. Harris will be DISMISSED WITH PREJUDICE.

### C. APRN Marinos

In Claim One, Phoenix argues that APRN Marinos violated his Eighth Amendment rights "for [his] actions . . . on not making corrections to the violations" and "for not providing medical care or medical aids for his serious medical condition of hearing loss and tinnitus . . . ." (ECF No. 38 ¶ 57; *see id.* at 14–19).  At most, Phoenix contends that APRN Marinos "was one of several nurse practitioners at [DCC] who was personally aware of [his] hearing loss and need for hearing aids through medical appointments, written complaints, grievances, staff investigations, and admin. meetings.  [APRN Marinos] offered no proper medical care or correction to the 8th Amendment" violations.  (ECF No. 38, at 4.)  Phoenix further suggests that he met with "other medical staff such as [APRN Marinos] and explained the issues of improper hearing aids, the re-testing and the new prescription for two hearing aids yet he failed to correct issues and allowed Phoenix to go with no proper hearing aids." (ECF No. 38, at 7.)  Again, Phoenix fails to demonstrate that APRN Marinos was deliberately indifferent to Phoenix's serious medical needs from his limited interactions with Phoenix about his hearing loss, tinnitus, and desire for hearing aids.

Although APRN Marinos saw Phoenix for a number of issues beginning in June of 2022, the first time Phoenix complained about his hearing or tinnitus was on August 9, 2022, during the chronic disease clinic, when he noted "ringing in his ears," among other problems.  (ECF No. 68-5, at 2.)  APRN Marinos noted that Phoenix had been referred to VCU for his ears.  (ECF No. 68-5, at 2.)  On August 23, 2022, APRN Marinos saw Phoenix for left elbow pain, noted that the MRI had been conducted and the referral to the ENT was complete.  (ECF No. 68-5, at 3.)

On October 18, 2022, Dr. Harris and APRN Marinos discussed many issues with Phoenix including an MRI for leg numbness, biceps repair surgery, a podiatry appointment, a need for orthotic boots, and the hearing aid and audiogram again.  (ECF No. 68-2 ¶ 13; ECF No. 68-5, at 3.)  Dr. Harris noted that the "[p]lan was to see if the audiogram could be done onsite, cancel VCU appt, but that [Phoenix] could go to VCU if this cannot be done onsite."  (ECF No. 68-2 ¶ 13.)  APRN Marinos noted that a referral was placed to VCU audiology, and Phoenix was referred to an orthopedist for his arm pain.  (ECF No. 68-5 ¶ 13.)

Between August 9, 2022 and October 18, 2022, the only time period during which Phoenix interacted with APRN Marinos for his hearing loss and tinnitus, Phoenix was under the care of other medical staff.  Phoenix fails to demonstrate that APRN Marinos ignored Phoenix's complaints.  Instead, APRN Marinos met with Phoenix and ensured that Phoenix has been referred to outside specialists for a variety of conditions, including his hearing loss and tinnitus.  Phoenix disagrees with the timing and course of care he received, but those challenges fail to support a claim of deliberate indifference.  Because Phoenix does not show that APRN Marinos was deliberately indifferent to his hearing loss and tinnitus, Claim One against APRN Marinos will be DISMISSED WITH PREJUDICE.

### D. **Nurse Schnur**

In Claim One, Phoenix argues that Nurse Schnur violated his Eighth Amendment rights "for [her] actions . . . on not making corrections to the violations" and "for not providing medical care or medical aids for his serious medical condition of hearing loss and tinnitus . . . ."  (ECF No. 38 ¶ 57; *see id.* at 14–19).  Phoenix contends that Nurse Schnur "was personally aware" that Phoenix "was not receiving proper testing or care . . . through medical appointments, meetings, admin meetings, written complaints, grievances, letters and walk throughs" and that she ignored the violation of his rights.  (ECF No. 38, at 4.)  Phoenix indicates that he wrote three letters

30

addressed to many administrators including Nurse Schnur complaining his "lack of medical care," for many ailments including hearing loss, tinnitus, and lack of hearing aids. (ECF No. 38 ¶¶ 51, 52, 53.)

The uncontroverted record demonstrates that Nurse Schnur was not involved in a clinical setting for Phoenix's hearing problems or tinnitus. Nurse Schnur organized and attended three meetings with medical staff about Phoenix's copious medical issues. (ECF No. 68-4 ¶ 13.) However, Nurse Schnur was not permitted to diagnose ailments or order diagnostic studies, medications, or make referrals to specialists. (ECF No. 68-4 ¶ 11.)

Clearly, Nurse Schnur attended meetings with medical staff and Phoenix, and she may have responded to his grievances[25] and received letters, but her role was limited to providing administrative assistance and oversight in coordinating care for Phoenix's abundant medical complaints and desires. (ECF No. 68-4 ¶ 8.) Moreover, it is undisputed that Nurse Schnur was aware of Phoenix's copious medical problems and his obvious disagreement with the treatment he was receiving. While an inmate's grievance materials or letters may establish a basis for § 1983 liability, the plaintiff must demonstrate "that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). Phoenix must show that Nurse Schnur "knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." *Id.* at 994 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).

---

[25] In his Complaint, Phoenix does not identify any specific grievance that Nurse Schnur responded to unfavorably. Phoenix, without elaboration, generally suggests that Nurse Schnur was aware of his complaints though grievances. This is wholly insufficient to show that Nurse Schnur was put on notice of a purported constitutional violation.

31

Phoenix fails to make this showing. Phoenix complained incessantly about his medical care. The fact that Nurse Schnur may have provided responses to his grievance material that did not satisfy Phoenix or did not respond to his letters, standing alone, does not make her deliberately indifferent. *See George v. Smith*, 507 F.3d 605, 609–10 (7th Cir. 2007) (explaining that simply "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation.") As explained in the Memorandum Opinion entered on January 5th, 2026, as to defendants who served in an administrative capacity,

> First, with respect to the letters, while Phoenix indicates that he mailed letters to these administrators he never indicates that each administrator received the letter. Nevertheless, assuming for the purposes of the Motion to Dismiss that the letters were received, Phoenix simply states that the intended recipients of the letters failed to change or intervene in his medical care generally. Phoenix describes the letters as notifying Defendants about his many medical issues and issues such as his perceived "lack of medical care" or "violations of his rights." (*See, e.g.*, ECF No. 38 ¶¶ 43, 44.) While Phoenix indicates that he mentioned his hearing loss and tinnitus in some his letters, this particular complaint was undoubtedly just one in a litany of other complaints about his medical care. *See supra* p.4 n.4. Simply because Phoenix declared his delay in receipt of hearing aids a violation of his Eighth Amendment rights in meetings, in letters, and in his grievances, does not make it so. Phoenix's allegations fall short of permitting the conclusion that his letters placed Defendants on sufficient notice of an excessive risk of harm to his health or safety with respect to his hearing loss and tinnitus. *See Vance*, 97 F.3d at 994. As such, Phoenix's limited factual allegations against Defendants fail to "produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 683).

*Phoenix*, 2026 WL 21754, at *10. The same holds true here with respect to Nurse Schnur.

While Phoenix believes that he was receiving inadequate medical care for his hearing loss and tinnitus and lodged the same complaint in his grievances, letters, and during administrative meetings Nurse Schnur attended, the record reflects that he was receiving a great

32

deal of medical care for his many ailments, including for his hearing loss and tinnitus.[26] Nurse

Schnur knew that Phoenix was frequently seen by and treated by the medical department.

According to his Complaint, between February of 2022 and August of 2024, standing

alone, Phoenix saw medical providers at least fifty-five times. (ECF No. 38 ¶ 10.) Between

November 2021 and October 2023, Phoenix had two audiology exams, three appointments with

VCU ENT, an appointment with a neurologist, and had been prescribed and received one hearing

aid. Phoenix was under the care of multiple medical providers including those within the

institution and several outside specialists. Nurse Schnur, who served in an administrative

capacity, and did not provide direct patient care, was entitled to rely on the medical judgment of

those abundant treating medical providers with respect to the appropriate treatment of Phoenix.

*Iko*, 535 F.3d at 242 (holding that once an inmate is placed in the care of appropriate medical

personnel, "a nonmedical prison official will generally be justified in believing that the prisoner

is in capable hands" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir 2004))).

Even if she met with Phoenix and discussed his case, absent extraordinary circumstances

not present here, Nurse Schnur, as a nurse, was not able to diagnose ailments or order diagnostic

studies, medications, or make referrals to specialists. (ECF No. 68-4 ¶ 11.) Nurse Schnur was

also entitled to rely upon the medical judgment of the many doctors with respect to the proper

course of treatment for Phoenix's injury. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 539

(3d Cir. 2017) (concluding nurse acted with no deliberate indifference by following doctor's

---

[26] For example, between 2021 and 2024, Phoenix "received pain medication, had x-rays, two MRIs, saw an onsite orthopedist and two orthopedic specialists and a neurologist, had elbow surgery, had twenty-eight physical therapy sessions, and then had a complete shoulder replacement surgery." *Phoenix v. Clarke*, No. 3:23cv276, 2025 WL 259382, at *7 (E.D. Va. Jan. 21, 2025). Phoenix was also treated during this same period for "celiac disease, a torn bicep tendon, neck and back injuries, hearing issues, breathing issues, dental problems and other ailments" and "was seen scores of times for these medical issues." *Phoenix v. Vital Core Health Strategies*, No. 3:23cv357, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025) (citation omitted).

orders); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (citation omitted) (observing that "a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, [but] that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient"). Phoenix fails to demonstrate that Nurse Schnur obstructed his medical care or stood by while the treating physicians pursued a course of treatment that posed an obvious, substantial risk of serious harm to his person. Although Phoenix desired a more expedited receipt of two hearing aids, as discussed above, Phoenix fails to show that the delay resulted in substantial harm to his person. Nurse Schnur was aware of Phoenix's complaints about the timing and course of treatment for his hearing loss and tinnitus. However, that fails to make her deliberately indifferent to those concerns. Because Phoenix fails to demonstrate that Nurse Schnur knew of and disregarded a substantial risk of harm to Phoenix, Claim One against her will be DISMISSED WITH PREJUDICE.

## VI. Analysis of ADA Claim (Claim Two)

### A. Title II of the Americans with Disabilities Act

In Claim Two, Phoenix contends that Defendants violated his rights under the ADA "due to staff not providing the necessary and prescribed hearing aids for his hearing loss . . . ." (ECF No. 38, at 19.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005) (quoting 42 U.S.C. § 12132). A state prison is a "public entity" for purposes of Title II of the ADA. *See United States v. Georgia*, 546 U.S. 151, 154 (2006). To state a claim under the ADA, a plaintiff must allege facts plausibly asserting that:

34

(1) [he or] she has a disability, (2) [he or] she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he or] she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his or] her disability.

*Constantine*, 411 F.3d at 498 (citations omitted). "A plaintiff is 'qualified' if [he or] she is 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Id.* (quoting 42 U.S.C. § 12131(2)).

### B. <u>The ADA Does Not Provide a Remedy Against Individual Defendants</u>

Defendants correctly assert that the ADA does not provide a cause of action against Defendants in their individual capacities.[27] *See Barnes v. Young*, 565 F. App'x 272. 273 (4th Cir. 2014); *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010). In his Response, Phoenix contends that the "Medical Defendants are proper defendants in an ADA claim because the ADA does permit civil action for damages against people sued in their individual capacity who were sub-contractors and control public space." (ECF No. 75, at 28.) However, Phoenix is incorrect. Defendants are not liable in their individual capacity.[28] Thus, Claim Two, which was

---

[27] Phoenix did not identify whether Defendants were named in their individual or official capacities. Defendants argue that "none of the Medical Defendants are proper defendants in an ADA claim because the ADA does not permit civil actions for damaged against persons sued in their individual capacities." (ECF No. 68, at 14–15 (citation omitted).) To the extent that Defendants intended to argue that no ADA claim may be brought against a Defendant in their *individual* capacity, they are correct.

[28] The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). Thus, "[b]y its plain language, this does not include private individuals or private entities." *Mills v Bishop*, No. 22-cv-1512-LKG, No. 22-cv-2805-LKG, No. 23-cv-0382-LKG, No. 23-1027-LKG, 2024 WL 185351, at *15 (D. Md. Jan. 17, 2024) (citations omitted). Therefore, Title II would not apply to the Defendants here who are employees of a private company providing health care services to jails and prisons. *See Kovalasky v. Horry Cty. Sheriff's Office*, No. 4:20-cv-0835-DCN-TER, 2022 WL 22248661, at

raised solely against Defendants in their individual capacity, will be DISMISSED WITH PREJUDICE.[29]

## VII. The Action is Malicious

The courts are charged with dismissing an action proceeding *in forma pauperis* at any time during the course of the litigation when it becomes clear that the action is frivolous or malicious. 28 U.S.C. §§ 1915A, 1915(e)(2); *see also White v. Gregory*, 1 F.3d 267, 269 (4th Cir. 1993). With respect to the second standard, this Court has observed that:

> A litigant may be deemed to act maliciously if his actions "[i]mport a wish to vex, annoy, or injure another, or an intent to do a wrongful act, and may consist in direct intention to injure, or in reckless disregard of another's rights." BLACK'S LAW DICTIONARY, Special Fifth Ed. at 863 (1981). Therefore, "the court must assess the character of the allegations insofar as they indicate a motive on the part of the plaintiff to merely harass or vex the defendants rather than to seek redress for a legitimate legal claim." *Daves v. Scranton*, 66 F.R.D. 5, 7 (E.D. Pa. 1975).

*Cain v. Com. of Va.*, 982 F. Supp. 1132, 1136 (E.D. Va. 1997). Further, "[t]he courts have long recognized that inmate complaints against state officials are a particularly fertile arena for frivolous and malicious litigation." *Id.* (citing *Daye v. Bounds*, 509 F.2d 66, 68 (4th Cir. 1975)). This is true, in part, because incarcerated litigants, "possess both time and dissatisfactions in abundance." *Cochran*, 73 F.3d at 1316. Furthermore, in assessing whether an action is malicious, the Court's review is not limited to the current complaint but is guided by the

---

*3 (D.S.C. Jan. 4, 2022) (explaining that "[e]very Federal Court of Appeals that has considered whether a private company that has contracted with a state to provide services on its behalf is a 'public entity' under Title II has answered the question in the negative" (citing *Kitchin v. Liberty*, No. 1:18-CV-00356-JDL, 2019 WL 2527088, at *7 (D. Me. June 19, 2019))).

[29] The Court already determined that Phoenix's ADA claim lacks merit because it failed to state a claim and was legally frivolous. *See Phoenix v. Clarke*, No. 3:23cv316, 2026 WL 21754, at *13–14 (E.D. Va. Jan. 5, 2026). As explained previously, the ADA may not be used to challenge medical judgments, *see id.* at *13–14, and Phoenix fails to satisfy the elements of an ADA claim, *id.* at *14. On summary judgment, Phoenix offers nothing that would alter those conclusions. Accordingly, the Court dismisses the ADA claim with prejudice.

36

plaintiff's past litigative conduct. *Id.* at 1316–17.

Phoenix filed suits against many of the same Defendants complaining that they denied him medical care for the plethora of his ailments and conditions. As the Court previously explained,

> Between August 2019 and 2024, Phoenix filed at least nineteen lawsuits in this division alone challenging various aspects of his medical care that have required the Court to expend a great deal of time and resources to resolve. Phoenix has filed vexatious and repetitive lawsuits against numerous VDOC employees, medical providers, and even attorneys for the Commonwealth charged with defending the actions, for every alleged ailment simply because he was dissatisfied with the level and type of care he received. While some of Phoenix's medical conditions may truly be considered serious, . . . his hearing loss and tinnitus and his delay in receipt of two hearing aids does not reach that level.

*Phoenix*, 2026 WL 21754, at *2 n.4. Phoenix received ample medical care for his hearing loss and tinnitus. Defendants and VDOC staff clearly spent countless hours addressing Phoenix copious medical complaints. Phoenix apparently used his time in the VDOC as an opportunity to receive more elective medical care than most non-incarcerated citizens receive. However, Phoenix plainly had no right "to have all his needed elective medical care performed while in custody . . . ." *Kersh*, 501 F.2d at 589.

Given the circumstances, the Court concludes that Phoenix initiated the current lawsuit in bad faith, and to harass and inconvenience Defendants. Accordingly, the Court will also dismiss the action as MALICIOUS pursuant to § 1915A(b)(1).

## VIII. Conclusion

The Motion for Summary Judgment (ECF No. 67) will be GRANTED. Claims One and Two will be DISMISSED WITH PREJUDICE. The action is DISMISSED as malicious. Phoenix's Motions to Stay (ECF Nos. 82, 86) and Motion for Discovery and Issuance of Subpoenas (ECF No. 84) will be DENIED. The Motion for Leave to File a Consolidated

Response (ECF No. 88) will be GRANTED.  The Clerk will be DIRECTED to note the

disposition of the action for the purposes of 28 U.S.C. § 1915(g).

      An appropriate Final Order shall issue.

| Date: **5/14/26**<br>Richmond, Virginia | /s/<br>M. Hannah Lauck<br>Chief United States District Judge |
| --- | --- |

38